OSCN Found Document:LARRY AUSTBO, Surviving Spouse of MARILYN AUSTBO, Deceased, v. GREENBRIAR, et al.

Previous Case

Top Of Index

This Point in Index

Citationize

Next Case

Print Only

LARRY AUSTBO, Surviving Spouse of MARILYN AUSTBO, Deceased, v. GREENBRIAR, et al.2025 OK 85Case Number: 123015Decided: 11/18/2025THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2025 OK 85, __ P.3d __

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

LARRY AUSTBO, Surviving Spouse of MARILYN DARLENE AUSTBO, Deceased, Plaintiff/Appellant,
v.
GREENBRIAR NURSING HOME NUMBER TWO, INC. d/b/a GREENBRIAR SKILLED NURSING; H. THOMAS SNYDER M.D., PLLC, and TOM SNYDER, M.D., Defendants/Appellees.

ON APPEAL FROM THE DISTRICT COURT OF GARFIELD COUNTY, OKLAHOMA

HONORABLE LANCE SCHNEITER, DISTRICT JUDGE

¶0 Plaintiff/Appellant Larry Austbo, surviving spouse of Marilyn Darlene Austbo, (Plaintiff) commenced an appeal in this case after the district court granted summary judgment in Defendants/Appellees Greenbriar Nursing Home Number Two, Inc., H. Thomas Snyder, and Tom Snyder, M.D.'s (Defendants) favor. Because this case turns on the interpretation and application of the federal Public Readiness and Emergency Preparation (PREP) Act, as well as our state's COVID-19 Public Health Emergency Limited Liability (COVID-19) Act, for which there is no binding precedent or prior ruling, we retained the appeal.

JUDGMENT OF THE DISTRICT COURT REVERSED; CASE REMANDED TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

Scott Allen, Scott Allen Law, Broken Arrow, Oklahoma, and Michael M. Blue, Blue Law, PLLC, Oklahoma City, Oklahoma, for Plaintiff/Appellant.

James K. Secrest, II, Joy Tate, Secrest, Hill & Butler, Tulsa, Oklahoma, for Defendant/Appellee Greenbriar Nursing Home Number Two, Inc. d/b/a Greenbriar Skilled Nursing.

Charles H. Moody, Emily Jones Ludiker, Austin M. Morris, Rodolf & Todd, Tulsa, Oklahoma, for Defendant/Appellee Thomas Snyder, M.D., PLLC, and Tom Snyder, M.D.

JETT, J:

¶1 The central issue in this case is whether Defendants are immune from Plaintiff's wrongful death claim based on both negligence and gross negligence. Defendants assert immunity under the federal Public Readiness and Emergency Preparation (PREP) Act, 42 U.S.C. § 247d-6d, and the state COVID-19 Public Health Emergency Limited Liability (COVID-19) Act, 63 O.S. § 6406

¶2 Upon de novo review, we hold that Defendants have failed to establish that they are immune. First, we hold that PREP Act immunity does not apply. Defendants have not produced evidence demonstrating that Plaintiff's claims for loss have a "causal relationship with the administration to or use by an individual of a covered countermeasure . . . ." 42 U.S.C. § 247d-6d(a)(2)(B). Second, we cannot determine that Defendants are immune from damages under the COVID-19 Act on the current record. Defendants have not produced evidence of the requisite impact required by 63 O.S. § 6406Id. § 6406(C)(2). Because Defendants are not immunized from Plaintiff's wrongful death claim under either the PREP Act or the COVID-19 Act, we reverse the district court's grant of summary judgment and remand with instruction to conduct further proceedings consistent with this opinion.

I.

A.

¶3 On December 16, 2020, Marilyn D. Austbo (Austbo) was admitted to Enid's Integris Bass Baptist Health Center (Integris Bass) with COVID-19 and Alzheimer's dementia. Her medical history included pneumonia, pulmonary fibrosis, hypertension, osteoarthritis, recurrent depressive disorders, cataracts, and operations to place a pacemaker and repair a hip fracture.

¶4 On December 18, 2020, Austbo was discharged from Integris Bass to Defendant Greenbriar Nursing Home Number Two, Inc. d/b/a Greenbriar Skilled Nursing (Greenbriar), a skilled nursing and support facility, for ongoing treatment and rehabilitation. Austbo's primary admitting diagnosis was "coronavirus unspecified."

¶5 During Austbo's 18-day stay at Greenbriar, Austbo was under the care of Defendant Tom Snyder, M.D. (Dr. Snyder), the facility's attending physician. Dr. Snyder examined, assessed, and oversaw Austbo's treatment for several ailments including COVID-19. He ordered and prescribed budesonide and ipratropium albuterol solution to treat Austbo's coronavirus infection. Dr. Snyder also facilitated Austbo's temporary transfer to Integris Bass for bamlanivimab (or BAM) treatment, an antibody infusion, in hopes this would help her turn the corner and prevent her COVID symptoms from worsening. Dr. Snyder ordered periodic blood tests, skin assessments, and physical and occupational therapy.

¶6 Ultimately Austbo's condition did not improve, either before or after the BAM treatment. On December 21, Dr. Snyder noted, "She has got bad dementia so it is going to be extremely limited on what we can do." As early as December 23, Dr. Snyder observed: "We are watching her day by day. There is not much else to offer her. She is so ill." Yet, he was "thrilled" Austbo received the BAM treatment. "We have added Azithromycin and now the Bam therapy and hoping that will help," commented Snyder. According to Plaintiff's proposed expert, Dr. John Clark, Austbo's condition declined while at Greenbriar. Clark observed that Austbo's medical record memorialized hypoxemic respiratory failure requiring oxygen supplementation, worsening mental status, decreased oral intake, and renal failure and hypernatremia secondary to Austbo's lack of fluid intake. According to testimony of Courtney Crow and Bobbie Jo Sutton, who apparently were nurses at Greenbriar, Austbo developed pressure wounds prior to her discharge from Greenbriar, though the severity of the wounds is disputed. It is not clear whether Austbo's family was advised of the pressure wounds.

¶7 According to Dr. Snyder, Austbo's family came to him and wanted to take her home. Dr. Snyder recommended hospice care. Notably, Dr. Clark agreed that hospice care would have also been his recommendation. Dr. Snyder told the family that Austbo's options were to either go home on hospice care or go back to the hospital. "I said the only way she can go home, my only really recommendation was if you're going to take her home you've got to try to give her water like we said and she's going to be on Hospice," testified Snyder.

¶8 On January 5, 2021, Austbo was discharged from Greenbriar. No home health or hospice arrangements were made. Austbo's family was purportedly uncomfortable with placing her on hospice care at that time.

¶9 The next day, Austbo returned to Integris Bass and was admitted to the intensive care unit (ICU). According to Dr. Clark's affidavit, upon arrival at Integris Bass Austbo had multiple pressure wounds, at least one of which had progressed to Stage III. Austbo required oxygen supplementation and was noncommunicative. She also received IV fluids and wound care. After showing some mild signs of improved mentation, Austbo was transferred from the ICU to the step-down unit. Upon transfer, Austbo's family was informed she would need a feeding tube due to aspiration risk. Austbo's family declined the feeding tube and decided that comfort care would be the goal of therapy. Nine days after her readmission to Integris Bass, Austbo was discharged home again, this time under the care of Circle of Life hospice services. She died at home on January 23, 2021.

B.

¶10 After Austbo's death, Plaintiff filed suit for negligent treatment and wrongful death. The Petition alleged, among other things, that Defendants were negligent and that their negligence caused and/or contributed to Austbo's death. Defendants answered and eventually moved for summary judgment. During the pendency of the summary judgment motions, Dr. Snyder moved to strike two "letters" from Dr. Clark, which had been submitted in support of Plaintiff's responses to the motions for summary judgment. After a motions hearing, the district court granted Dr. Snyder's motion to strike but gave the parties leave to supplementally respond and reply to the motions for summary judgment. Each did, and Plaintiff attached an affidavit from Dr. Clark to his supplemental response, which Defendants did not move to strike.

¶11 After reviewing the briefs and conducting a hearing on the previously tabled motions, the district court granted Defendants' motions for summary judgment, holding both the PREP Act and the COVID-19 Act immunized Defendants. (ROA, Doc. 22, Jan. 24, 2025 Hr'g Tr. at 8:23--9:4 ("In my opinion, based on the undisputed facts set forth, all of the issues that are incident to being in a skilled-nursing center or a hospital setting, if they are proximately caused by coming in as a Covid patient, then these Acts should grant immunity to the medical providers.").) Plaintiff timely appealed. Upon Dr. Snyder's motion, we exercised our discretion and retained the appeal.

II.

¶12 The summary judgment process provides for a prompt, pretrial disposition of claims or cases where only questions of law remain. Myers v. Lashley, 2002 OK 1444 P.3d 55312 O.S. § 2056Tiger v. Verdigris Valley Elec. Co-op., 2016 OK 74410 P.3d 1007

¶13 "Whether summary judgment was properly entered is a question of law which we review de novo." Martin v. Aramark Servs., Inc., 2004 OK 3892 P.3d 96De novo review affords this Court with "plenary, independent[,] and non-deferential authority to determine whether the trial court erred in its application of the law and whether there is any genuine issue of material fact." Id. Whether a fact is "material" is dictated by the substantive law applicable to the parties' claims and defenses. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (the substantive law will identify "which facts are critical and which facts are irrelevant"). Indeed, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. "Factual disputes that are irrelevant or unnecessary will not be counted." Id. By contrast, whether a dispute about a material fact is "genuine" does not depend upon the substantive law but upon the evidence. "If under the evidence, reasonable persons would reach different conclusions, summary judgment is improper." Wittenberg v. Fid. Bank, N.A., 1992 OK 165844 P.2d 155see also Anderson, 477 U.S. at 248 ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

¶14 Resolution of this matter requires us to interpret and apply both federal and state statutes. Issues of statutory interpretation present questions of law which we also review de novo. Crawford v. OSU Med. Tr., 2022 OK 25510 P.3d 824

III.

A.

¶15 Defendants have failed to establish that they are entitled to summary judgment on Plaintiff's wrongful death claim pursuant to the PREP Act's grant of immunity. The PREP ActId. § 247d-6d(a)(2)(B). If PREP Act immunity applies and there is no willful misconduct, injured individuals must seek compensation from the Covered Countermeasure Process Fund rather than pursuing a claim in state or federal court. Id. § 247d-6e(a). If a covered person who would otherwise be entitled to PREP Act immunity engaged in willful misconduct, the sole venue for adjudicating the claim is the United States District Court for the District of Columbia. Id. § 247d-6d(e)(1).

¶16 In this case, Defendants assert that they are entitled to PREP Act immunity because: (1) Defendants are covered persons; (2) covered countermeasures were administered to and used by Austbo; and (3) Plaintiff's claim for loss has a causal relationship with the administration to or use by Austbo of a covered countermeasure. We assume without deciding both that Defendants are covered persons under the PREP Act and that covered countermeasures were administered to and used by Austbo. Even so, Defendants are not entitled to summary judgment because they have not demonstrated the requisite causal relationship between Plaintiff's injury and the administration or use of a covered countermeasure.

¶17 In the operative petition, Plaintiff alleges that Austbo "suffer[ed] skin breakdowns, dehydration, and malnutrition" because Defendants failed to ensure that Austbo's "basic life necessities, such as mobility, nutrition, and hydration," were met. (ROA, Doc. 4, Second Am. Pet. ¶ 12.) In his motion for summary judgment, Dr. Snyder argued he administered certain covered countermeasures, "including, among other things, thermometers, PPE, budesonide and ipratropium albuterol solution, in treating resident with respect to the virus." (ROA, Doc. 8, Dr. Snyder's MSJ at 13.) Greenbriar claims it administered the same countermeasures to Austbo. However, neither of Defendants' motions for summary judgment posit undisputed material facts or otherwise supply evidence to support a finding that Plaintiff's injury has a causal relationship with the administration or use of thermometers, PPE, or budesonide and ipratropium albuterol solution.

¶18 In their joint supplemental reply, Defendants for the first time attempt to argue that a causal relationship exists. First, Defendants argue:

[T]he care and treatment available to treat her COVID-19 and the sequela therefrom was limited. As established by DON [Director of Nursing] Carmen Fore, Greenbriar utilized a COVID-19 unit, which was segregated from other portions of the facility and restricted visitors.

(ROA, Doc. 18, Defs.' Suppl. MSJ Reply at 4.) There can be instances in which a covered person may be immunized from injuries resulting from the failure to provide a covered countermeasure when the countermeasure is in short supply. E.g., Maney v. Brown, 91 F.4th 1296, 1301 (9th Cir. 2024). However, here Defendants fail to establish a connection between Plaintiff's injury and the withholding of a countermeasure due to "[p]rioritization or purposeful allocation." Id.

¶19 Second, Defendants claim "Dr. Snyder prescribed her [Austbo] various breathing treatments to provide relief from her COVID-19 symptoms." (Defs.' Suppl. MSJ Reply at 4.) According to Defendants:

[T]hese medications

(Id.)

¶20 Although Defendants' argument has logical appeal, there is a problem. It is argument, not evidence. Summary judgment requires us to "test[] the legal sufficiency of the evidential materials in support . . . [of] the motion . . . ." Nelson v. Enid Med. Assocs., 2016 OK 69376 P.3d 212see also Kincaid v. Black Angus Motel, Inc., 1999 OK 54983 P.2d 1016

¶21 Decisions from other jurisdictions have demonstrated the evidence needed to establish a causal relationship between a covered countermeasure and a plaintiff's loss to trigger PREP Act immunity. In Wilhelms v. ProMedica Health Sys., Inc., the Court of Appeals of Ohio analyzed whether the PREP Act immunized defendants from medical malpractice claims in a case in which the plaintiff developed pressure ulcers (bed sores) after being diagnosed with COVID-19 and treated with a ventilator and respirator, which are covered countermeasures. 205 N.E.3d 1159, 1161 (Ohio Ct. App. 2023). The trial court decided that it did. Id. at 1161. However, the Ohio appeals court reversed the trial court's judgment as a matter of law because "there [was] a genuine material dispute as to whether [plaintiff's] claims for loss are caused by, arose out of, relate to, or resulting from the administration to or use of a covered measure." Id. at 1165 (citation modified). Judgment as a matter of law was precluded as "[n]o depositions or affidavits were filed establishing causation between [plaintiff's] pressure ulcers and the use of the ventilator/respirator." Id.

¶22 Conversely, in Ashley v. Anonymous Physician 1, the Indiana Court of Appeals affirmed summary judgment for medical providers in a case in which the plaintiff developed bed sores when being treated for COVID-19. 245 N.E.3d 658, 2024 WL 4142508, at *1 (Ind. Ct. App. 2024) (unpublished table case). In that case, defendants produced affidavits stating that plaintiff's "condition continued to deteriorate due to COVID-19, causing the need for him to be sedated, intubated, immobilized, and placed on a ventilator in the intensive care unit for nineteen days and opining to a reasonable degree of medical certainty that the injuries that [the plaintiff] experienced . . . were due to his need to be intubated and placed on a ventilator to save him from dying from COVID-19." Id. at *2 (citation modified). With this evidence, the appeals court affirmed that the plaintiff's claims were caused by or related to the administration of a covered countermeasure and immunity applied. Id. at *4.

¶23 From an evidentiary standpoint, this case is like Wilhelms rather than Ashley. None of Defendants' material facts nor any other evidence in the record demonstrates a causal relationship between Austbo's claims and the countermeasures administered by Defendants. 42 U.S.C. § 247d-6d(a)(2)(B). Thus, Defendants cannot establish PREP Act immunity at the summary judgment stage.

B.

¶24 Defendants have also failed to establish that they are entitled to summary judgment on Plaintiff's wrongful death claim pursuant to the COVID-19 Act's grant of immunity. The COVID-19 Act provides:

A health care facility or health care provider shall be immune from civil liability for any loss or harm to a person with a suspected or confirmed diagnosis of COVID-19 caused by an act or omission by the facility or provider that occurs during the COVID-19 public health emergency, if

1. The act or omission occurred in the course of arranging for or providing COVID-19 health care services for the treatment of the person who was impacted by the decisions, activities or staffing of, or the availability or capacity of space or equipment by, the health care facility or provider in response to or as a result of the COVID-19 public health emergency, and

2. The act or omission was not the result of gross negligence or willful or wanton misconduct of the health care facility or health care provider rendering the health care services.

63 O.S. § 6406

¶25 There is no dispute that Defendants satisfy the criteria for immunity set forth in the first paragraph of § 6406(C): (1) Defendants are health care facilities or providers; (2) Plaintiff is seeking relief for harm to a person--the alleged wrongful death of his late wife; (3) Austbo had a confirmed case of COVID-19; and (4) the alleged harm to Austbo occurred during the state's COVID-19 public health emergency, which spanned from March 15, 2020 to May 4, 2021.

1.

¶26 Subsection (C)(1) of 63 O.S. § 6406

¶27 The first requirement of § 6406(C)(1) is clear from the text of the statute. When a statutory requirement is unambiguous, our inquiry into the meaning of a provision begins and ends with the text. Hall v. Galmor, 2018 OK 59427 P.3d 105263 O.S. § 6406Id. § 6406(C)(1). Employing the definition provided by the Legislature, we conclude the plain meaning of "COVID-19 health care services" is any services provided by a health care facility, health care provider, or by an individual working under the supervision of a health care facility or provider, that relate to the diagnosis, assessment, prevention, treatment, aid, shelter, assistance, or care of COVID-19 and related illnesses, injuries, or conditions.

¶28 Defendants correctly assert that their allegedly negligent acts and omissions occurred in the course of Defendants providing COVID-19 health care services to Austbo, who presented to Greenbriar with coronavirus infection. Her health deteriorated when she did not respond favorably to COVID treatments. Austbo would not have been admitted to Greenbriar but for her coronavirus infection, and her death precipitated from the coronavirus infection. Dr. Clark concedes this point, opining that if Austbo had been treated differently "she would have survived her COVID infection." (ROA, Doc. 17, Ex. A to Pl.'s Suppl. MSJ Resp. (Dr. Clark Aff.) at 17.) Austbo was receiving COVID-19 health care services during the entirety of her stay at Greenbriar, and her injuries arose in the course of Defendants' provision of COVID-19 health care services.

¶29 But this is not the end of the analysis. Subsection (C)(1) in 63 O.S. § 6406 who was impacted by the decisions, activities or staffing of, or the availability or capacity of space or equipment by, the health care facility or provider in response to or as a result of the COVID-19 public health emergency." Id. (emphasis added). We find § 6406(C)(1)'s "impact" requirement is susceptible to two interpretations and is, therefore, ambiguous. In re Assessments for Tax Year 2012 of Certain Properties, 2021 OK 7481 P.3d 883see also Hall, 2018 OK 59

¶30 One possible interpretation of § 6406(C)(1)'s impact requirement is that every person who received COVID-19 health care services was impacted by the decisions or activities of a provider as a result of the COVID-19 public health emergency. But this interpretation has textual problems. First, "[a] statute must be read to render every part operative and to avoid rendering parts superfluous or useless. . . . [W]e must interpret legislation so as to give effect to every word and sentence." Rickard v. Coulimore, 2022 OK 9505 P.3d 920

The act or omission occurred in the course of arranging for or providing COVID-19 health care services for the treatment of the person who was impacted by the decisions, activities or staffing of, or the availability or capacity of space or equipment by, the health care facility or provider in response to or as a result of the COVID-19 public health emergency; and

63 O.S. § 6406Rickard, 2022 OK 9

¶31 Second, the "everyone was impacted" interpretation is in tension with the precise words used by the Legislature. According to the text, the injured person must have been "impacted by the decisions, activities or staffing of, or the availability or capacity of space or equipment by, the health care facility or provider in response to or as a result of the COVID-19 public health emergency." 63 O.S. § 6406Id. § 6406(B)(1). The Governor's emergency declarations referenced in 63 O.S. § 6406

¶32 The Legislature's choice to condition immunity on a person being impacted by the decisions, activities, staffing, or capacity of providers "in response to or as a result of the COVID-19 public health emergency" rather than merely "in response to COVID-19" is significant. For instance, there were some Oklahomans who never received COVID-19 health care services but were impacted by the decisions, activities, staffing, or capacity of providers in response to or as a result of the COVID-19 public health emergency. Between March 24 and April 24, 2020, all elective surgeries, minor medical procedures, and non-emergency dental procedures were postponed due to the COVID-19 public health emergency, which certainly impacted patients who were scheduled for these procedures.

¶33 Conversely, a person can receive care today that falls within the definition of COVID-19 health care services, but they are not impacted by the expired COVID-19 public health emergency. Even during 2020 and 2021, it is possible that a person could have received COVID-19 health care services yet was not impacted by the strain on the medical system precipitated by the COVID-19 health care emergency.

¶34 The text of 63 O.S. § 6406 response to or as a result of the COVID-19 public health emergency are two separate criteria for immunity. We reject the interpretation of § 6406(C)(1) that would mean any person receiving COVID-19 health care services meets § 6406(C)(1)'s impact requirement. This interpretation would render more than half the text in § 6406(C)(1) a nullity and does not comport with the precise words use by the Legislature.

¶35 Instead, the impact requirement in 63 O.S. § 6406Lynch v. Citadel Elizabeth City, LLC, 2:21-CV-48-D, 2022 WL 2707701, at *3 (E.D.N.C. July 12, 2022). Considering the scope of the Governor's emergency declarations alone, it is apparent that the same is true under 63 O.S. § 6406

¶36 In Defendants' summary judgment briefing, they reference § 6406(C)(1)'s impact requirement by asserting that "Mrs. Austbo was impacted by the medical decision-making of Defendants in response to or as a result of the COVID-19 public health emergency." (Defs.' Suppl. MSJ Reply at 13.) Yet, they do not point to evidence in support of this assertion, and none of the material facts set forth in Defendants' motions for summary judgment support this contention.

¶37 The closest Defendants come to demonstrating (with evidence) that Austbo was "impacted" is in their analysis of the PREP Act. (Defs.' Suppl. MSJ Reply at 2--5.) Defendants posit that "Greenbriar utilized a COVID-19 unit, which was segregated from other portions of the facility and restricted visitors," but they fail to connect-the-dots. (Id. at 4.) The deposition testimony referenced by Defendants does not show that care in Greenbriar's COVID section varied from care in the non-COVID section or that this separation affected the facility's operations as a whole with some impact to Austbo. In fact, the testimony does not even establish that Austbo resided in the COVID unit during her stay at Greenbriar.

¶38 Even though the impact requirement does not appear difficult to meet in light of the profound disruption attendant to the COVID-19 public health emergency, Defendants have not met this burden at the summary judgment stage.

2.

¶39 For purposes of summary judgment, Defendants also fail to satisfy subsection (C)(2) of 63 O.S. § 640625 O.S. § 6Fox v. Oklahoma Mem'l Hosp., 1989 OK 38774 P.2d 459

¶40 The question of whether Defendants have met their burden on summary judgment on the question of gross negligence is a close call. In his testimony, Dr. Snyder explained that Austbo's family approached him wanting to take her home from Greenbriar. Dr. Snyder claims to have told the family that Austbo's options were to be placed on hospice care or go back to the hospital. Plaintiff's expert agreed that he would have also recommended hospice care. However, Austbo's family was not ready to place her in hospice at that time, and Austbo was eventually discharged without hospice or home health arrangements. Two days later, Austbo was admitted to Integris Bass' intensive care unit and was eventually discharged on hospice care.

¶41 Defendants did not offer expert testimony with respect to the standard of care applicable to Defendants or causation of Austbo's injuries. Plaintiff, on the other hand, submitted an affidavit from Dr. Clark opining on the standard of care to which Defendants should be subjected and on causation issues. After recitation of his professional credentials and an extensive factual review, Dr. Clark concluded:

In my opinion, discharging a patient like Ms. Austbo, with clearly worsening wounds, worsening hypernatremia, worsening renal failure, and worsening dehydration, without any plan to address her serious issues with fluid administration, wound care, lab monitoring, and close follow-up shows a lack of even the most basic and slightest care a physician and nursing facility should provide any patient.

(Dr. Clark Aff. at 18.) Dr. Clark also opined:

In all reasonable medical probability, if Ms. Austbo's wounds had been prevented and/or addressed more aggressively and her worsening hypernatremia, acute renal failure, and metabolic encephalopathy had been addressed sooner she would have survived her COVID infection.

(Id. at 17.) Defendants did not challenge Dr. Clark's qualifications or methodology in the trial court, and whether Dr. Clark's opinion testimony is admissible has not been raised in this appeal.

¶42 In light of Dr. Snyder's testimony that Austbo's family requested she be discharged home, the family's rejection of hospice care--which both Drs. Snyder and Clark agree was appropriate--and Dr. Snyder's presentation of care options for Austbo, reasonable minds can differ on whether Defendants' conduct rises to the level of intentional failure to perform a manifest duty in reckless disregard of the consequences or in callous indifference to the life of another. But that is just the point. Reasonable minds may differ. We conclude that Dr. Clark's unchallenged opinion testimony nudges the question of gross negligence over the line into a genuine issue of material fact.

¶43 As enacted, the COVID-19 Act makes the lack of gross negligence a necessary element of liability immunity. Thus, the genuine fact issue with respect to gross negligence precludes summary judgment in favor of Defendants.

IV.

¶44 The dispositive question before us is whether Defendants are immune from Plaintiff's wrongful death claim at the summary judgment stage. For the foregoing reasons, they are not.

JUDGMENT OF THE DISTRICT COURT REVERSED; CASE REMANDED TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

EDMONDSON, COMBS, GURICH, DARBY and JETT, JJ., CONCUR.

ROWE, C.J. (by separate writing), KUEHN, V.C.J., WINCHESTER (by separate writing), KANE, JJ, DISSENT.

FOOTNOTES

12 O.S. § 2056

However, Dr. Clark's subsequent testimony attached to Plaintiff's supplemental response is an affidavit. Defendants did not move to strike Dr. Clark's affidavit or challenge his qualifications or methodology under the Daubert standard. The trial court, in its gatekeeping function, has not yet assessed whether Clark should be allowed to testify as an expert at trial. This is a determination to be made by the trial court in the first instance, but for purposes of summary judgment, we will consider the opinion testimony of Dr. Clark.

Cannon v. Watermark Ret. Communities, Inc., 45 F.4th 137, 139 (D.C. Cir. 2022). Immunity is triggered when the U.S. Secretary of Health and Human Services (Secretary) issues a declaration "identifying the threat to public health, the period during which immunity is in effect, and other particulars." Id.; accord 42 U.S.C. § 247d-6d(b). On March 17, 2020, the Secretary issued the requisite declaration in response to the COVID-19 pandemic. Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198-01 (Mar. 17, 2020). Although the Secretary amended the PREP Act declaration several times, neither party disputes that the declaration had been made and was in effect during Austbo's admission, stay, and discharge from Greenbriar.

available at https://www.sos.ok.gov/documents/executive/
1913.pdf. A series of subsequent executive orders continued the COVID-19 public health emergency. The COVID-19 public health emergency was affirmatively concluded on May 4, 2021. Exec. Order 2021-11 (May 3, 2021), available at https://www.sos.ok.gov/
documents/executive/1999.pdf.

available at https://www.sos.ok.gov/documents/
executive/1975.pdf; Sixth Amended Exec. Order 2020-13 (May 12, 2020), available at https://www.sos.ok.gov/documents/executive/1943.pdf.

available at https://www.sos.ok.gov/documents/executive/1919.pdf; Second Amended Exec. Order 2020-13 (Apr. 16, 2020), available at https://www.sos.ok.gov/documents/executive/1931.pdf.

available at https://oklahoma.gov/content/dam /ok/en/governor/documents/1932.pdf.

Fent v. Oklahoma Capitol Imp. Auth., 1999 OK 64984 P.2d 200

ROWE, C.J., with whom KUEHN, V.C.J., joins, DISSENTING:

¶1 In 2005, Congress passed the Public Readiness and Emergency Preparedness Act (the "Act") to promote the rapid development and deployment of medical countermeasures in response to a declared public health emergency invoked by the Secretary of the Department of Health and Human Services. 42 U.S.C.A. § 247d-6d(b). The Act provides broad immunity for covered persons from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if the Department of Health and Human Services has declared a public emergency. 42 U.S.C.A. § 247d-6d(a)(1). This immunity applies to any claim or loss that has a causal relationship with the administration or use of a covered countermeasure. 42 U.S.C.A. § 247d-6d(a)(2)(B).

¶2 The causal relationship contemplated by the Act is not to be construed narrowly. Congress intentionally employed broad language--"caused by, arising out of, relating to, or resulting from"--to ensure expansive immunity. This language demonstrates Congress' intent that immunity is not limited to direct causation but encompasses all claims bearing any causal or relational connection to the administration or use of a covered countermeasure.

¶3 In applying the Act, its breadth cannot be overlooked. When COVID-19 spread rapidly across the globe, little was known about how to combat the spread of the pandemic and treat it. The HHS Secretary declared COVID-19 a public health emergency, triggering the Act's immunity. Unless evidence establishes "willful misconduct," a covered person is immune from all claims arising out of, relating to, or resulting from the administration or the use of a covered countermeasure.

¶4 The Majority suggests that in order to for the Act to apply, Defendants must construct a detailed causal chain between the use of a covered countermeasure and the claimed loss. The Majority found Defendants failed to construct the requisite causal chain, finding "Defendants have not asserted in their material facts or otherwise provided any evidence that (1) breathing treatments have side effects such as stomach pain, flu-like symptoms, fatigue, and muscle weakness; (2) that Austbo suffered from any side effects as a result of the breathing treatments; or (3) that side effects caused Austbo to refuse food or water, precipitating her injuries." Majority Op. ¶ 20. However, the causal chain the Majority demands exceeds the requirement of the Act.

¶5 I would find that once covered countermeasures were used and treatment resulted in loss or injury, the Act's immunity attaches without requiring a detailed causal chain. The Act extends immunity to any loss that "arises out of," "relates to," or "results from" the administration or use of a covered countermeasure. Its language does not require a rigid link-by-link causation requirement.

¶6 Here, the evidence shows that Ms. Austbo was admitted to Greenbriar Nursing Facility with COVID-19,

¶7 Plaintiff's loss arose out of the administration of or use of covered countermeasures. Accordingly, Defendants are entitled to immunity. Because I would find Defendants immune under the Act, Plaintiff's state law claim under Oklahoma's COVID-19 Act is preempted and need not be addressed.

FOOTNOTES

Id.

Winchester, J., with whom Kuehn, V.C.J. joins, dissenting:

¶1 I agree with the majority's ruling that Greenbriar Skilled Nursing and Dr. Tom Snyder (collectively "Defendants") are covered persons under the PREP Act and administered covered countermeasures to Marilyn Darlene Austbo ("Austbo"). I disagree with the conclusion that Defendants have not established that they are immune. Larry Austbo's ("Spouse") claims for loss are causally related to the administration of the countermeasures provided to Austbo.

¶2 The PREP Act "provides sweeping immunity for certain claims against certain covered individuals." Pirotte v. HCP Prairie Village KS OPCO, LLC, 580 F. SupP.3d 1012, 1020 (D. Kan. 2022) (emphasis added). In the PREP Act, Congress plainly provided immunity under both federal and state law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure. 42 U.S.C. § 247d-6d(a)(1). The Act defines "loss" as "any type of loss," including death; physical, mental, or emotional injury, illness, disability, or condition or the fear of, including any need for medical monitoring; and loss of or damage to property, including business interruption loss. 42 U.S.C. § 247d-6d(a)(2)(A).

¶3 The majority concludes that Defendants have not proved a causal relationship between Spouse's claims for loss and the administration of countermeasures provided to Austbo. However, this conclusion overlooks the primary purpose of the PREP Act, which uses inclusive language to cover all claims for all losses. The Act requires only that a loss be either caused by, arise out of, relate to, or result from the administration of, or an individual's use of, a covered countermeasure. Other courts have described the PREP Act's causation language in broad terms. See, e.g., Maney v. Brown, 91 F.4th 1296, 1300-01 (9th Cir. 2024) (describing an "expansive causal relationship" between the administration of covered countermeasures and the plaintiff's claim). We should also construe the causation requirement of the PREP Act in a broad manner.

¶4 The majority appears to apply a more stringent causal relationship requirement than necessary. Causal is defined broadly as "of, relating to, or involving causation." Causal, Black's Law Dictionary (12th ed. 2024), available at Westlaw BLACKS. The statute at issue uses three distinct phrases in addition to "caused by" to describe the necessary causal relationship under the PREP Act. We cannot ignore the other phrases used, as we must interpret legislation to give effect to every word and sentence, not rendering parts superfluous. In re Baby Girl L., 2002 OK 951 P.3d 544

¶5 Examining the definitions of each of these phrases--arising out of, relating to, or resulting from--provides insight into the extent of the necessary causal relationship. See, e.g., U.S. Fid. & Guar. Co. v. Briscoe, 1951 OK 386239 P.2d 754De Becker v. UHS of Del., Inc., 555 P.3d 1192(Nev. 2024), the court clarified the meanings of all four phrases and is instructive here. First, the court explained that the term "caused by" signified "actual cause, meaning a plaintiff must prove that 'but for' the event, the plaintiff's damages would not have occurred." Id. at 1202.

¶6 The court next clarified that the term "arise out of" requires only "a general causal connection," making it broader than the phrase "caused by." De Becker, 555 P.3d at 1202.

¶7 The court then noted that the ordinary meaning of "relating to" is even broader. It implies "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with," and the words express a broad preemptive purpose. Id. at 1202; see also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47 (1987) (explaining that the phrase "relate to" has a "broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan'"); Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739 (1985) (interpreting "relates to" "in the normal sense of the phrase" as denoting having "a connection with or reference to"); Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123, 128 (2d Cir. 2001) (noting the phrase "related to" is synonymous with "associated with" and "with reference to").

¶8 The court concluded its analysis by noting that "a thing 'results' [from something] when it [a]rise[s] as an effect, issue, or outcome from some action, process or design." De Becker, 555 P.3d at 1202; see also Burrage v. United States, 571 U.S. 204, 211 (2014) (noting that "results from" imposes "a requirement of actual causality," "proof that the harm would not have occurred in the absence of--that is, but for--the defendant's conduct").

¶9 These definitions indicate that a causal relationship does not require "but for" causation. Instead, a defendant only needs to demonstrate that the claimant's injury is related to (i.e., associated with) the administration of a covered countermeasure.

¶10 Other jurisdictions have recognized a causal relationship in a broad range of acts or omissions. For example, in Cowen v. Walgreen Co., the plaintiff claimed that while visiting a Walgreens store for a flu vaccine, a Walgreens employee mistakenly administered a COVID-19 vaccine without her knowledge. No. 22-CV-157-TCK-JFJ, 2022 WL 17640208, at *2 (N.D. Okla. Dec. 13, 2022). The plaintiff argued that her claims should be interpreted broadly, contending that her injury could have occurred regardless of whether she received a COVID-19 vaccine or another type of vaccine. Id. In other words, she was not claiming any physical injury nor insisting that her injury was solely related to the COVID-19 vaccination. However, the court in Cowen held that while it was true that other vaccinations or procedures might have been administered, this did not alter the fact that her claims resulted from the administration of the COVID-19 vaccine. The PREP Act therefore applied. Id.

¶11 Similarly, other courts have found defendants immune against claims for failure to consent to covered countermeasures. See M.T. ex rel. M.K. v Walmart Stores, Inc., 528 P.3d 1067, 1070 (Kan. Ct. App. 2023) (holding that a mother's claims that her minor child received a COVID-19 vaccine without parental consent arose out of and related to the administration of the vaccine, falling within PREP Act immunity); Politella v. Windham Se. Sch. Dist., 325 A.3d 88, 95-97 (Vt. 2024) (holding a defendant immune against a claim for failure to obtain parental consent before administering a COVID-19 vaccine to minor); see also Parker v. St. Lawrence Cnty. Pub. Health Dep't, 102 A.D.3d 140, 144 (N.Y. App. Div. 2012) (concluding that a claim that a minor was administered a vaccine without parental consent was barred by the PREP Act).

¶12 These cases illustrate that even complaints regarding the administration of a countermeasure without any physical injury can fall under the immunity of the PREP Act. Therefore, the majority's emphasis on needing additional evidence to establish a causal link between Austbo's physical injury and the countermeasure is misplaced and applies an unnecessarily stringent standard of causation.

¶13 Here, Austbo presented as an 81-year-old woman with her primary diagnosis being COVID-19. She spent 18 days at Greenbriar Skilled Nursing ("Greenbriar") under the care of Dr. Snyder. Defendants administered certain covered countermeasures to treat her COVID-19--thermomotors, PPE, budesonide, and ipratropium albuterol solution. Defendants were admittingly limited on what they could do to treat her COVID-19 because of her Alzheimer's dementia. Austbo's condition declined, leading to respiratory failure that required oxygen supplementation, worsening mental status, decreased oral intake, and pressure wounds. Spouse alleges that Austbo suffered skin breakdowns, dehydration, and malnutrition while at Greenbriar.

¶14 The evidence presented shows that Austbo's injuries that she allegedly sustained during her time at Greenbriar--skin breakdowns, dehydration, and malnutrition--were at a minimum related to the administration of the countermeasures for her COVID-19. Austbo did not exhibit these injuries when she first arrived at Greenbriar, and the treatment she received was all incident to presenting with a COVID-19 diagnosis. Like in Cowen, while other procedures might have also been administered, this does not change the fact that Austbo's alleged injuries (i.e., malnutrition) were connected to or associated with the administration of COVID-19 countermeasures (i.e., worsening oral intake while treating her COVID-19). For these reasons, I would hold that Defendants established that they are immune under the PREP Act. Spouse's claims for loss have a causal relationship with the administration of the countermeasures provided to Austbo.

The Oklahoma Supreme Court
2100 N. Lincoln Blvd., Suite 1
Oklahoma City, OK 73105